GEORGE A. FULLER COMPANY, Plaintiff, *v.* CEDAR-WILLIAM STREET CORPORATION, Defendant.

Supreme Court, New York County, January 9, 1930.

*Frederick M. Sanders* [*Louis Salant* of counsel], for the plaintiff.

*Wise, Whitney & Parker* [*Hiram C. Todd* of counsel], for the defendant.

CALLAHAN, J.   The plaintiff (the contractor) erected an office building for the defendant (the owner).   The plaintiff claims a balance due of $45,007.43, with interest, for which it asserts a lien. The owner denies that it owes anything, contending that it has overpaid the contractor.   It, in turn, asserts counterclaims on the basis that the contractor defrauded the owner of large sums by means of a scheme of increasing estimates of costs and by erroneously duplicating charges by inserting said items both as costs and in a certain ten per cent allowance, which will be later referred to.   It asks for an accounting between the parties.   The contract was in writing, carefully drawn by the parties after numerous conferences, at some of which lawyers represented them, and detailed and volu- minous plans and specifications were prepared.   The contract named as architects men of apparently wide experience, who were designated as the owner's agents.   The contractor was a large construction firm, and the owner's president a builder of some experience.   The provisions of the contract applicable to the dis- puted points were that the contractor was to furnish the labor and materials in the erection of the building in accordance with the plans and specifications.   The owner agreed to pay the cost incurred by the contractor and a fixed fee of $43,000.   The contractor agreed that the main work specified would not cost in excess of $836,053, including the fee of $43,000, and, if it exceeded said sum, the con- tractor was to pay the excess.   The parties knew the contract covered only part of the work.   In order to obtain a finished build- ing, a great deal of construction not included in the main contract was required.   The original plans specified some of this additional work, but it was later omitted, with the understanding it would be ordered as alterations or extras.

The contract provided that, if alterations involving extra cost were ordered, the contractor was to furnish to the architect or owner an estimate of the extra cost, and, on giving an order for the extra work, the amount of the guaranteed limit cost of $836,053 was to be increased by the amount of such estimate. The contractor further agreed that, if certain of the work originally contemplated was later ordered, the contractor was to receive no fees in addition to the $43,000 until the cost of the work contracted for, plus the contemplated extra work and the $43,000 fee, reached the sum of $960,182. The contract then provided that the contractor was to receive " the cost to it plus 10 per cent. (10%) for general conditions and a commission of $6\frac{1}{2}\%$ thereon in addition for all work in excess of $960,682 and for any and all additional work which the contractor may be called upon to perform " under the contract. It was further provided in the contract that the contractor was to furnish to the architect on the first of each month an estimate of the cost incurred to date; the architect was to deliver a certificate approving so much of said estimate as he found correct, and the owner was to pay the contractor the sum specified. Vouchers showing actual payments were to be submitted by the contractor. If not objected to in thirty days, the items of expenditure embraced in the vouchers were deemed approved.

The three main points in dispute between the parties are: (1) Was the contractor required to segregate the cost of extras from the cost of the main work under the contract? (2) Have the defendants established that the contractor committed fraud in intentionally overestimating the cost of the extras so that they might receive the benefit of an enlarged guaranteed limit price? (3) What is the meaning of the provision in the contract that " the contractor shall receive the cost to it plus 10 per cent. *for general conditions* and a commission of $6\frac{1}{2}$ per cent. thereon in addition for all work in excess of $960,682? " (Italics mine.) The first question requires a consideration of the contract provisions relating to (a) costs, (b) the guaranteed limit price, (c) the contractors' allowances, and (d) extras; also a consideration of the practical construction given the contract provisions by the parties. It has been seen that the contractor was to get actual cost plus certain fees in certain contingencies; that for the main work he fixed a limit price; that the parties contemplated extras; that, when extras were ordered, the limit price was to be increased by the amount thereof; that a certain form of monthly accounting was required. The alterations and extras did not, nor were they intended to, await the finishing of the main work. They consisted in many instances of preparations for contemplated tenants of partitions, plumbing, wiring, etc. This work was ordered as the

main work progressed, and it clearly was not contemplated, nor was it practical, to segregate the cost of the main work from the costs of the extras. Many items of such cost were practically indivisible. For example, if a hoist was erected to bring up materials, the cost of that hoist was a proper item of charge. Could it be said that the contractor was to keep track of the quantities of materials hoisted on it that were used in the main work and the quantities used in the doing of the extras? I do not think that any such arrangement was ever intended. The upset or guaranteed limit price was a variable figure. It was known it would increase as the extras were ordered.

The owner now complains that, by submitting grossly exaggerated estimates of the cost of extras, the contractor was enabled to avoid paying the excess of the cost of the main work over $830,053. Assuming that that happened, it was caused by two things: *First,* the contract provision that the limit price was to change each time an extra was ordered; and, *second,* that the owner ordered the extras done without requiring a more conservative estimating of the cost of the extras. The proof as to the fairness of these estimated costs will be discussed later. The contention of the owner that the contractor was to segregate the cost of the two branches of the work is, in my opinion, neither warranted by the contract nor supported by a consideration of the practical side of the job involved. In fact, it appears clearly as an afterthought. Neither the owner nor his architect ever requested it or objected to the contrary method which was consistently pursued. The testimony on the second claim of the owner, that the contractor was guilty of a fraud in that it willfully and intentionally submitted grossly excessive estimates of the cost of extras ordered, was voluminous.

The owner's counsel have carefully and painstakingly reviewed this testimony. They have prepared elaborate and imposing tabulations and comparisons of the estimates involved with the subcontractors' prices. By comparative analysis of the testimony, the owner's expert witnesses, and the " break-down sheets," or detailed estimates, which the contractor used in arriving at the lump sum estimates, it attacks the fairness of the estimated prices for extras. A careful scrutiny of this proof convinces me that the elements of fraud not only have not been established, but that there is no basis for the claim. It is true that in many instances the unit prices used in estimating the costs of extras were larger than those contained in the subcontracts. This appears to me readily understandable and to be expected. That the cost of performing a given quantity of extra work ordinarily exceeds that of a similar quantity of the main work was established. The contractor, when called on to do a particular item of extra work (and

these items were varied in size and nature), was entitled to estimate the cost thereof so as to be certain it would not undertake the same at a loss. Assuming that it submitted liberal estimates, that did not mean that it was guilty of dishonesty. The contract made the contractor liable for the excess if the actual cost exceeded the initial guaranteed limit, plus the estimated cost of the extras. The contractor frankly conceded that it made its est mates reasonably safe. It surely was entitled to do so. I concede that the execution of a fraudulently conceived plan to grossly exaggerate the estimates in order that the contractor might eliminate a loss would constitute a fraud, even though the representations consisted of an approximate future cost. The questions of how the damage entailed thereby might be determined need not be considered. Suffice it to say that the proof is wholly lacking to support any claim of fraud. I do not understand that the owner contends that its architect was a party to the fraud. The architect felt that the estimates were large in some instances, but he never rejected any bid on that ground. The owner's president was a practical builder, yet he personally approved of each estimate. In some instances, " break-down sheets " of the estimates were requested by, and furnished to, defendant. There surely was no concealment. On the trial the owner submitted expert opinion testimony that these estimates were grossly excessive. This testimony, to say the least, was not convincing. I am not satisfied that there was either an intention to deceive on the part of the contractor nor that the owner was deceived. Fraud has not been established, and the counter-claims are dismissed.

The remaining question is the construction of the contract provision with relation to the allowance of ten per cent for " general conditions." Defendant owner contends that this provision means that as to extras the items of general expense, or " job costs," such as permits, water, insurance, etc., as distinguished from those costs which would be allocated to some particular " trade," were not to be paid by the owner as items of cost (though they were properly so charged as to the main work), but were to be covered by the allowance of ten per cent. The contractor contends that it was entitled to charge all " job costs " in connection with extras as " cost," and that the ten per cent for " general conditions " was a sum in addition thereto for the increased general office overhead that the doing of extras entailed.

The meaning of the phrase " general conditions " as used in the contract is uncertain. The specifications contained a title heading " The general conditions of the contract." There follows a long series of articles or contract provisions applicable to the work as a whole. Following this series of articles are the specifications proper.

The phrase " general conditions " is used in two of the articles referred to. The 1st article is as follows: *"Principles and Definitions.* The contract documents consist of the agreement, the general conditions of the contract, the drawings and specifications. * * * These constitute the contract." The 46th article is entitled " General conditions of the contract." It specifies that a certain standard form on file in the office of the general contractor, together with modifications and articles enumerated and later set forth, shall form part of all agreements under the contract. It is manifest that the term " general conditions " in the 13th paragraph of the contract is not used in the same sense as it is in the subtitle or text above cited from the specifications. The articles contained in the specifications which are termed general conditions are those terms or provisions of the contract which apply to the work generally. They contain references in many instances to labor and materials involved in the work of the main trades. In the specifications it apparently is used to show which conditions of the contract are generally applicable as contrasted with the later specific provisions. While the meaning intended in paragraph 13th is not clear if the phrase is considered alone, if the context is considered it is evident that it was not used to eliminate the right on the part of the contractor to charge for " job cost " in connection with extras. The very paragraph specifically provides otherwise. It says that for such extras the contractor is to receive *the cost to it* plus ten per cent for general conditions, plus the stated commission for work in excess of the figure named.

The word " cost " as used in the contract is also specifically defined to include many of the items of so-called " job costs." In order then to have the term " 10% for general conditions " interpreted to exclude the right of the contractor to charge actual " job costs " on the extras, the word " cost " as to extras must be given an entirely different meaning from that specified in the contract as the meaning to be assigned to it. Plaintiff's contention that the " ten per cent. for general conditions " meant a charge to cover the heavy general administrative overhead incurred in connection with the doing of extra work seems more logical. I am not unmindful of the fact that the plaintiff's summary showing how the figure $836,053 was arrived at classified what would ordinarily be the job costs uses the heading " general conditions." Some witnesses testified that this phrase is used in more than one sense in the building trade. This is apparent from what occurs in this very contract. Many absurd situations would occur if the construction contended for by defendant were followed. On the other hand, the allowance of ten per cent as a charge for overhead plus the six and one-half per cent for commissions would not, as defendant

contends, create a double charge or be an exorbitant or unusual one. Plaintiff allowed its own subcontractors ten per cent for overhead, plus ten per cent for profit on extra work. Again, the propriety of the construction of the contracts contended for by the plaintiff appears conclusively established by the particular construction given it by the parties themselves. Throughout the performance of the work the plaintiff submitted vouchers containing " job costs " on extras to defendant's architect and to defendant itself. These vouchers were retained for more than thirty days without complaint. Defendant knew that it was bound to reject them or they were deemed correct. It apparently maintained this same attitude right down to the time this action was brought for in one of the answers which the defendant served it pleaded the very construction which it now rejects in connection with an alleged overcharge by the plaintiff for workmen's compensation insurance. The premiums on workmen's compensation insurance were clearly a " job cost," yet the defendant by its answer stated that the plaintiff was entitled to charge a fair sum for such workmen's compensation insurance (without distinguishing extras from the main work), but that the sum plaintiff charged was exorbitant. Under all the circumstances, the contract must be construed as plaintiff contends.

Judgment is awarded the plaintiff adjudicating the existence of a lien in its favor for the sum demanded in the complaint, with interest. Submit appropriate decision and findings.